UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SWINERTON BUILDERS, CORPORATION,
d/b/a SWINERTON BUILDERS,

        Plaintiff,

v.                                                                          CASE NO.

TAMPA ELECTRIC COMPANY,

        Defendant.
_____/

## COMPLAINT FOR DAMAGES

Plaintiff, Swinerton Builders, Corporation, d/b/a Swinerton Builders ("Swinerton"), sues Defendant, Tampa Electric Company ("TECO").

## PARTIES, JURISDICTION, AND VENUE

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the matter in controversy is between parties that are citizens of different states and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

2. This Court has supplemental jurisdiction over Swinerton's state law claim pursuant to 28 U.S.C. § 1367 because that claim is so related to the claims in this action that are within the original jurisdiction of the Court pursuant to 28 U.S.C. § 1332(a) that they form part of the same case or controversy.

3. Swinerton is a California corporation that is authorized to conduct business in Florida, with its principal place of business in San Francisco, California, making it a citizen of California pursuant to 28 U.S.C. § 1332(c)(1).

4. TECO is a Florida corporation with its principal place of business in Tampa,

Hillsborough County, Florida, making it a citizen of Florida pursuant to 28 U.S.C. § 1332(c)(1).

5.      Venue is appropriate in this Court because: (a) a substantial part of the events or omissions giving rise to Swinerton's claims occurred within, (b) the property that is the subject of the action is situated within, and/or (c) TECO's principal place of business is located within the boundaries of the Middle District of Florida and within one of the counties within the province of the Tampa Division of this Court.

## GENERAL ALLEGATIONS

### The Project and the Contract

6.      Swinerton is a contractor with expertise in the development and construction of, among other things, utility-scale photovoltaic solar projects.

7.      TECO provides utility services to customers throughout Central Florida. As part of its efforts to expand the use of solar power, TECO undertook to finance and own an approximately 37.5 $MW_{AC}$ solar photovoltaic electric power facility (the "Facility") on real property located at 2200 Bonnie Mine Road, Bartow, Polk County, Florida (the "Property"), commonly referred to as the Bonnie Mine Solar Project (the "Project").

8.      To this end, on November 6, 2017, TECO provided a Limited Notice to Proceed to Pacific Northwest Solar, LLC ("PNW") for the Project. The Limited Notice to Proceed laid out various tasks that PNW and TECO agreed to complete by certain milestone dates "while the parties [were] negotiating terms for a definitive agreement . . . for the turnkey design, engineering, procurement and construction of solar photovoltaic (PV) arrays." On March 7, March 12, and April 2, 2018, TECO authorized PNW to perform additional preliminary work. The Limited Notice to Proceed and additional work authorizations are collectively referred to herein as the "LNTP."

9.      Among its obligations under the LNTP, TECO had to submit the "Project

2

Entitlement Application" to Polk County by January 12, 2018, and had to receive approval of that application by May 1, 2018. (The LNTP actually shows these dates as January 12, 2017, and May 1, 2017, respectively. When considering the date of the LNTP and the other dates identified in it, the reference to 2017 must be a clerical error that should say 2018.)

10. On March 12, 2018, Swinerton and PNW entered a Development Agreement. A copy of the Development Agreement is attached as **Exhibit "A."**

11. Under the Development Agreement, PNW exercised "its development rights by having [Swinerton] and TECO, who is or will be the owner of the Project, will [sic] enter into a Balance of System Contract for the Project . . . pursuant to which [Swinerton] will provide TECO with certain project development, design, engineering, equipment procurement, construction, commissioning and testing services with respect to the Project."

12. On May 2, 2018, Swinerton and TECO entered a Balance of System Contract ("Contract"). A copy of the Contract (without exhibits due to their size) is attached as **Exhibit "B."**

13. Under the Contract, Swinerton agreed to furnish certain labor, services, and/or materials for the design, engineering, permitting, surveying, procurement, construction, installation, interconnection, commissioning and testing on the Project, for an original Contract Price of $34,301,425.00. Swinerton's full scope of work is more fully described in Exhibit A to the Contract and is referred to in this Complaint as the "Work."

14. Consistent with the purpose of the Development Agreement, Section 2.2 of the Contract explains that, simultaneously with its execution, Swinerton and PNW would execute an Assignment and Assumption Agreement. Under that agreement, PNW would assign all of its rights and duties under the LNTP to Swinerton and Swinerton would accept and assume those

rights and duties.

15. Exhibit C to the Contract delineates the permits for which either TECO or Swinerton were responsible. TECO agreed to obtain, among other things, all environmental permits required for the Work as well as an Environmental Resource Permit ("ERP") from the Florida Department of Environmental Protection ("FDEP"). Swinerton, on the other hand, agreed to obtain, among other permits, the building permits from Polk County.

16. Section 7.2 of the contract specified that Swinerton would achieve Commercial Operation by December 31, 2018. Section 8.2 of the Contract specified that Swinerton would achieve Substantial Completion by January 11, 2019. Exhibit V to the Contract included the Project Schedule that reflected the mutually agreed path that, if followed, would allow Swinerton to meet these dates.

17. The Contract explicitly contemplated "Changes" to the Contract either in terms of time or cost.

18. Specifically, Section 5.1(a) defines a "Change," in part, as,

> (iii) Delay or other demonstrable adverse impact on Contractor's activities under this Agreement resulting from acts or omissions causing material interference or delay by Owner or Owner Contractors (unless and to the extent such delay or adverse impact is also the result of acts of Contractor or Subcontractors)... provided (and Contractor's right to relief hereunder is expressly subject to the condition) that Contractor in each case shall have provided written notice to Owner, within seven (7) Business Days after becoming aware of such material interference or delay, describing the particulars of such delay or interference and the probable impact (or a reasonable estimate thereof, based on available information) on the performance of Contractor's obligations hereunder,

***

> (viii) An Unforeseen Subsurface Condition that materially and adversely affects Contractor's ability to perform as required

hereunder.

19. Section 1.1 of the Contract defines "Unforeseen Subsurface Conditions," in part, as "(i) subsurface or latent physical conditions at the Project Site differing materially from those specifically located and described in the Geotechnical Report set forth in Exhibit O . . . ."

20. Section 5.2 of the Contract provides, in pertinent part, that

> [t]o the extent that a Change demonstrably affect's Contractor's ability to perform the Work, the time or cost . . . of doing so or any other obligation under this Agreement, Contractor or Owner shall be entitled to an equitable adjustment as appropriate to the Contract Price, the Progress Schedule or such other parts of this Agreement as may be affected by such Change . . . .

21. Section 5.3 of the Contract required Swinerton to submit to TECO a written proposal for dealing with the impact of any Change within 30 days "of the conclusion of the circumstance giving rise to such asserted Change."

**TECO's Permit-Related Delay**

22. On May 2, 2018, TECO issued a Notice to Proceed to Swinerton authorizing it to proceed under the Contract beginning May 4, 2018.

23. Swinerton could not proceed with its work until it obtained a building permit from Polk County.

24. However, Swinerton could not obtain that permit until TECO fulfilled its contractual obligation to secure several other permits from state and local governmental agencies.

25. One such permit TECO had to obtain before Swinerton could obtain the building permit was a Land Use Permit from Polk County. This permit would change the allowable use of the site from its prior use as a phosphate mine to use as a solar power facility.

26. The LNTP required TECO to submit the Project Entitlement Application (which

included the Land Use Permit) by January 12, 2017, and required TECO to receive entitlement (that is, approval of the Land Use Permit) by May 1, 2017. (As noted above, the LNTP uses 2017 when, in context, Swinerton believes it intended to use 2018.)

27. The Project Schedule also required TECO to submit the Environmental Resource Permit application by April 26, 2018, and to obtain approval by July 13, 2018.

28. Polk County had to issue the Land Use Permit, and the Florida Department of Environmental Protection had to issue an Environmental Resource Permit before Swinerton could obtain a Building Permit.

29. The Project Schedule attached as Exhibit V to the Contract clearly indicated that to achieve the Contract Milestones, Swinerton needed receive the Building Permit by July 6, 2018 and that any delay to the Permit would delay the Contract Milestones.

30. Notwithstanding the timeline the LNTP and the Contract dictated, TECO did not submit the Land Use Permit application by January 1, 2018 as required. It did so on February 7, 2018, (more than a month late).

31. TECO did not receive approval of the Land Use Permit by March 1, 2018 as required. That approval came on September 10, 2018 (more than 6 months late).

32. Additionally, TECO did not receive FDEP approval of the ERP by July 13, 2018 as required.

33. It obtained FDEP's approval on August 24, 2018 (five weeks late).

34. On June 22, 2018, Swinerton notified TECO of the Potential Schedule Impact in light of its anticipated July 13, 2018 mobilization, after obtaining all requisite permits.

35. Despite TECO's delays, Swinerton worked to mitigate the impact to the schedule by continuing to work toward securing the permits for which it was responsible.

6

36. Normally, Polk County would not consider a building permit application until after approving a land use permit.

37. However, Swinerton negotiated with Polk County to review the Building Permit concurrently with its review of TECO's Land Use Permit.

38. As part of its mitigation effort, Swinerton applied for the Building Permit on April 12, 2018.

39. Because of Swinerton's efforts, on September 12, just two days after the approval of the Land Use Permit, Polk County issued the Building Permit allowing Swinerton to begin construction.

**The Initial Geotechnical Investigation**

40. Ardaman & Associates, Inc. ("Ardaman"), a licensed professional engineer in the State of Florida, prepared the "Geotechnical Report" mentioned in Section 1.1 of, and incorporated into, the Contract. In that December 20, 2017 report, Ardaman concluded, "[i]n the general site area, we believe that the [seasonal high groundwater level] will be at least 5 feet below grade." In other words, Ardaman stated that groundwater would not be encountered in the first five feet below the surface.

41. Ardaman had previously authored a report in September 2017 outlining its findings from additional site evaluations it performed to determine pile performance. Ardaman concluded that "[t]he W6x- Section piles proposed for the Bonnie Road Site can support the proposed design loads."

42. Swinerton independently retained Terracon Consultants, Inc. ("Terracon"), a licensed professional engineer in the State of Florida, to provide geotechnical engineering services for the Project as well.

43. Terracon furnished a July 10, 2018 Geotechnical Engineering Report – Revised, which presented the findings of its "subsurface exploration, lab results and the double ring infiltration (DRI) tests." Those activities took place in early 2018.

44. Terracon's report provides "geotechnical recommendations concerning earthwork and the design and construction of foundations for the proposed project."

45. Consistent with the results of Ardaman's Geotechnical Report, Terracon explained that "[g]roundwater was not observed within the upper 10 feet" of certain borings, and identified only two borings as having demonstrated groundwater at a depth of 5 ½ to 5 feet. Thus, like Ardaman, Terracon concluded that groundwater would not be encountered in the first five feet below the surface.

**Unforeseen Subsurface Conditions**

46. Almost immediately upon mobilizing onsite, Swinerton encountered unexpectedly high groundwater levels and resultant soil conditions that differed materially from those described in the Ardaman and Terracon geotechnical reports. These unforeseen subsurface conditions significantly and adversely impacted Swinerton's operations. (Swinerton hereafter refers to those conditions generally as the "Unforeseen Subsurface Conditions"). More specifically, when Swinerton began mobilizing both light and heavy equipment on or about September 5, 2018, the saturated soils would not support the equipment. Some of the equipment sank into the soil.

47. On September 11, 2018, Swinerton team members observed water bubbling up to the surface in areas across the site, some in locations where Terracon's geotechnical report indicated the groundwater should have been at least 4.5 feet below the surface.

48. The next day, Swinerton sent an e-mail to Terracon and various members of the Project's design and engineering team advising that it "ran into a challenge on [the Project] (we

8

believe it is a natural spring or unusually high water table)." Swinerton attached photos and explained that the area depicted "was dry (visually no signs of water) before the scrapper drove across it," but that "[t]he weight of the scrapper caused it to sink and then the water came up." Swinerton noted that its field team described the condition as like "running on a water bed." Swinerton further explained that, "[p]er the geotech report, the groundwater in the area was 9' below existing ground and we only excavated a few feet, and called for everyone's help to brainstorm solutions."

49. About a week later, on September 20, at various places across the site, Swinerton encountered groundwater while excavating basically at the surface.

50. These Unforeseen Subsurface Conditions reduced Swinerton's productivity by over 50%, prevented Swinerton from efficiently using its construction equipment across the Project site and significantly impacted Swinerton's ability to perform its Work.

51. The Project design basically called for solar panels mounted on steel piles driven into the ground. Due to the groundwater encountered at higher levels than expected, however, piles of the length the design contemplated sunk into the ground with little to no resistance. Clearly, those piles would not support the solar panels.

52. As a result, on September 21, 2018, Swinerton sent a letter to TECO to serve as "notification of finding of differing soil conditions throughout the Bonnie Mine Solar project site." Swinerton advised that it was "continuing to do grading work in areas that are available while working with Terracon our Geotechnical Engineer and Testing Company to complete the ongoing investigation of options and to address these discovered conditions for submission to TECO."

53. Swinerton's letter enclosed a report from Terracon that documented its observations during its September 13 site visit. Terracon advised that that "[t]here are several

areas on the site where water is at or near the surface." Terracon explained that it had reviewed local rainfall data for 2018 as compared to historical data, and that, "[b]eginning in May, the rainfall is well in excess of the monthly averages. Through August, the areas has received approximately 60 inches of rainfall compared to the normal average of approximately 40 inches." This represented a "50% surcharge above the average rainfall for the area which would cause the groundwater depth to rise above normal depths." Terracon concluded that, "[c]onsidering the rainfall totals experienced and the near surface high water table or perched water table, these conditions are considered a changed condition from what was encountered in our borings and what would normally be expected."

54. While the evaluation of the site condition continued, Swinerton performed additional pile testing on September 24, 2018 to investigate alternative methods of construction to keep the Project moving with as little schedule impact as possible.

55. The results of Swinerton's evaluation showed that longer piles than contemplated in the original design would provide the necessary structural support for the solar panels and still meet the Project's design criteria.

56. Critically, however, Swinerton's electrical and structural design subcontractor, (Blymyer Engineers) concluded that simply welding the already acquired shorter piles together would not meet the Project's design criteria.

57. Thus, Swinerton bought longer piles in a quantity that represented approximately 50% of the total piles on site at an added cost of $1,859,078.99.

58. Swinerton informed TECO that it was proceeding with the longer piles.

59. In total, the Unforeseen Subsurface Conditions resulted in Swinerton having to replace 5,320 piles with long piles.

**Change Order Request**

60. Because of TECO's front-end permit delays and the Unforeseen Subsurface Conditions, Swinerton submitted a request for Change Order #002-R2 to TECO on October 12, 2018 ("Change Order Request"). Swinerton sought an increase of $2,650,573.00 in the Contract Sum and a 30-day extension of the Contact Time. A copy of the Change Order Request is attached as **Exhibit "C."**

61. TECO rejected the Change Order Request. It asserted that its review of the Ardaman geotechnical report indicated "no significant differences with respect to current subsurface conditions."

62. TECO also wrongly maintained that, because of the close dates on which the Polk County permits and Environmental Resource Permit were issued, "Swinerton is not entitled to schedule or cost relief."

63. In sum, TECO claimed that Swinerton was not entitled to schedule or cost relief for either issue, and directed Swinerton to complete the Project "in the contracted timeframe and cost."

64. Despite TECO's initial "rejection" of the Change Order Request, the parties continued to discuss the merits of the request for months thereafter. If TECO truly believed that Swinerton was not entitled to additional time or money, there would have been no need for these additional discussions. Swinerton relied in good faith on the discussions when proceeding with further work/incurring additional costs.

65. The continued discussions about the Change Order Request are reflected as follows:

   a. Swinerton's Monthly Construction Progress Report for October 2018, noted that Swinerton disputed TECO's denial of the Change Order Request.

   b. On November 1, 2018, Swinerton responded to TECO's October 26

correspondence and provided additional support for its Change Order Request. Swinerton reiterated that "[t]he Environmental Resource Permit (ERP) and the Polk County Site Plan Entitlement Permit were owner required permits as specified in Exhibit C of the EPC contract," and that the delay in their issuance "caused 30 working days of delay in the project schedule." Swinerton advised that the delay not only caused it to incur additional costs due to additional storage and relocation of materials, but also that "[i]t is no longer possible to accelerate construction operations to achieve energization by the end of 2018." Swinerton explained that it would, thus, provide a new schedule calling for energization in early 2019.

c. Swinerton further explained that the geotechnical reports from Ardaman and Terracon "indicated groundwater levels to vary from 4 feet below grade to greater than 10 feet below grade in varying locations through the site." Actual groundwater levels encountered in September 2018, however, "were significantly higher than the levels shown in the Terracon geotechnical report." Such differing ground water conditions, Swinerton explained, "caused the additional costs due to the need for longer piles and dewatering operations . . . ."

d. Meeting Minutes for a November 7, 2018 conference call between representatives of TECO, Swinerton, and PNW reflect that the Change Order Request was "still under discussion and ha[d] not been resolved."

e. Meeting Minutes dated November 28, 2018 note that the Change Order Request "is being re-reviewed at this time."

f. Days later, on December 4, 2018 TECO's Mark Ward e-mailed Swinerton's David Grubb, Jr. and explained that he was working on a response to the Change Order

        Request through TECO's senior management, and hoped to have something the next day, i.e., December 5, 2018. That response, however, never came.

    g.    Throughout January 2019, representatives from TECO continued to request further information from Swinerton about the Change Order Request. In fact, Meeting Minutes dated as late as April 17, 2019 show that Swinerton was still awaiting TECO's feedback on the Change Order Request.

66.    Notwithstanding TECO's failure to resolve Swinerton's Change Order Request, TECO issued Swinerton a Mechanical Completion Certificate on February 18, 2019, certifying that "Mechanical Completion of the Facility has been achieved . . . ."

67.    Weeks later, on March 4, 2019, Swinerton submitted a Commercial Operation Completion Certificate to TECO certifying that "the conditions precedent for Commercial Operation of the Facility . . . have been achieved," which TECO certified, without exception.

68.    Less than two weeks later, on March 15, 2019, Swinerton submitted a Substantial Completion Certificate to TECO certifying that "the conditions precedent for Substantial Completion . . . have been achieved." As before, TECO certified Substantial Completion, without exception.

69.    Having received no further response from TECO as to its Change Order Request, Swinerton provided TECO additional information on September 20, 2019, which included an executive summary of the events underlying the Change Order Request and nearly one thousand pages of supporting material. Swinerton thoroughly documented the significant impact TECO's permit-related delays caused and quantified, using an industry standard Critical Path Method analysis, Swinerton's entitlement to a 71-calendar day extension of the Commercial Operation date as a result of TECO's delays and mitigation efforts due to TECO's constructive acceleration

notice. Further, Swinerton outlined the significant delay costs and costs incurred as a result of the Unforeseen Subsurface Conditions.

70. Six days later, TECO sent Swinerton a one-page, perfunctory letter rejecting Swinerton's change order request.

71. TECO's permit-related delays and the effects of the Unforeseen Subsurface Conditions significantly impacted the Project's schedule and, thus, entitled Swinerton to an extension of the Commercial Operation date and extended administrative staff and jobsite oversight costs.

72. The Unforeseen Subsurface Conditions resulted in Swinerton incurring significant additional costs for, among other things, longer piles, extra dewatering costs, extended administrative staff costs, extended jobsite overhead, and additional non-production craft labor costs. Swinerton also incurred material handling and overtime premium damages and suffered significant productivity losses in its earthwork and steel pile installation.

73. Altogether, Swinerton's damages for the Unforeseen Subsurface Conditions and front-end permit delays by TECO total approximately $3,161,726.00, which does not include hundreds of thousands of dollars of unabsorbed home office overhead costs.

74. Despite Swinerton's entitlement to additional money and time as a result of the foregoing, TECO failed and/or refused to award Swinerton any additional money or time.

75. Moreover, TECO has failed and/or refused to timely and properly pay Swinerton in full for its Work on the Project. The unpaid contract balance that TECO owes is $658,053.00, excluding interest. This amount is separate from the damages incurred as a result of the permit-related delays and the Unforeseen Subsurface Conditions.

76. To secure its right to payment of the unpaid contract balance, Swinerton recorded

a Claim of Lien against the property on which the Project is located. The Property is more particularly described in the Claim of Lien, which is attached to this Complaint as **Exhibit "D,"** and incorporated herein by reference.

77. Swinerton has retained the undersigned attorneys to represent it in this action and is obligated to pay these attorneys a reasonable fee for their services rendered.

78. All conditions precedent to the filing of this Complaint have been performed, excused or waived.

## COUNT I – BREACH OF CONTRACT

79. Swinerton realleges and incorporates the allegations of paragraphs 1 through 78 as though fully set forth herein.

80. Swinerton and TECO entered the Contract on May 2, 2018.

81. Swinerton performed all of its obligations under the Contract or was discharged of such obligations due to TECO's breaches.

82. TECO substantially and materially breached the Contract by, among other things, failing and/or refusing to timely and/or properly pay Swinerton in full for its Work, failing to timely obtain the permits it was required to obtain so Swinerton could perform its work, and failing to award Swinerton additional time and costs as a result of TECO's delay in obtaining the permits and the delays and costs encountered as a result of the Unforeseen Subsurface Conditions.

83. As a direct result of TECO's breaches of the Contract, Swinerton has suffered damages, including, without limitation, principal damages of not less than $3,729,101.00, attorneys' fees, costs, and expenses.

WHEREFORE, Swinerton respectfully requests that this Court enter judgment in favor of Swinerton and against TECO, in an amount to be proven at trial in excess of $3,729,101.00, plus

interest, court costs, and such further relief as this Court deems appropriate and in the interests of justice.

## COUNT II – UNJUST ENRICHMENT

84. Swinerton realleges and incorporates the allegations of paragraphs 1 through 9, 22 through 28, 31 through 59, 77, and 78 as though fully set forth herein.

85. Swinerton conferred a substantial and material benefit to TECO by accelerating its work efforts to mitigate the impact of TECO's front-end permit delays and by providing longer piles than the Contract required to address the Unforeseen Subsurface Conditions encountered.

86. TECO understood the benefit Swinerton conferred and it knowingly and voluntarily accepted the benefit.

87. The benefit of Swinerton's Work, including the installation of longer piles and other work necessitated by the permit delays and Unforeseen Subsurface Conditions, flowed directly to TECO.

88. The reasonable value of such work performed, but not yet paid by TECO, is at least $3,161,726 (the costs Swinerton incurred due to the permit delays and Unforeseen Subsurface Conditions).

89. Under the circumstances, it is inequitable for TECO to retain the benefit of Swinerton's work without playing for the value thereof.

WHEREFORE, Swinerton respectfully requests that this Court enter judgment in favor of Swinerton and against TECO, in an amount to be proven at trial in excess $3,161,726, plus interest, court costs, and such further relief as this Court deems appropriate and in the interests of justice.

## COUNT III – CLAIM OF LIEN

90.     Swinerton realleges and incorporates the allegations of paragraphs 1 through 78 as though fully set forth herein.

91.     This is an action pursuant to chapter 713, Florida Statutes, to establish and foreclose on a Claim of Lien on the Property for the Work. The Property is more particularly described in the Claim of Lien, which is attached to this Complaint as **Exhibit "D,"** and incorporated herein by reference.

92.     At all times material to this action, TECO owned the Property.

93.     Swinerton furnished the first of its labor, services, or materials to the Property on or about June 4, 2018, and the last of same on or about February 16, 2019.

94.     The total value of the Work that Swinerton furnished on the Property was $34,305,835.00, of which $2,320,289.00 remained due, owing and unpaid as of May 16, 2019, the date of the recording of the Claim of Lien.  As stated in the Claim of Lien, this amount does not include, among other things, "amounts due or to become due for [Swinerton's] unresolved claims for additional expense and compensation, and all rights with respect thereto, including the right to amend this Claim of Lien are hereby reserved."

95.     On May 16, 2019, Swinerton timely recorded its Claim of Lien against the Property for $2,320,289.00 in the Public Records of Polk County, Florida.

96.     On or about May 23, 2019, Swinerton served a copy of the Claim of Lien to TECO.

97.     On May 16, 2019, Swinerton served a copy of its final payment affidavit to TECO in accordance with section 713.06(3)(d), Florida Statutes.

98.     Swinerton later recorded a Partial Satisfaction and Release of Lien after receiving a partial payment of $1,662,236.00 from TECO ("Partial Satisfaction").  Like the Claim of Lien, the Partial Satisfaction clarifies that this sum does not include, among other things, "amounts due

17

or to become due for [Swinerton's] unresolved change orders and claims for additional expense and compensation, and all rights with respect thereto are hereby reserved."

99. A remaining balance of $658,053.00 remains owed and unsatisfied under the Claim of Lien.

100. Swinerton timely filed this action within one year after recording its Claim of Lien and complied with all conditions precedent and all statutory prerequisites to bringing this action under the laws of Florida.

101. Swinerton retained the undersigned attorneys to represent it in this action and is obligated to pay these attorneys a reasonable fee for the services rendered and costs incurred herein. Swinerton is entitled to recover its attorneys' fees and costs pursuant to section 713.29, Florida Statutes.

WHEREFORE, Swinerton requests that this Court:

a. Provide TECO an opportunity to pay off the Claim of Lien within the time period set by this Court;

b. Order that in default of payment, the Property be sold; and

c. Order that out of the proceeds of the sale, there be paid the costs of the sale, and that the remainder be applied to the amount due Swinerton, plus interest, costs, and attorneys' fees.

   s/ *Brett D. Divers*   
BRETT D. DIVERS, ESQ.
Fla. Bar No. 973246
Email: bdivers@mpdlegal.com
Secondary: sjames@mpdlegal.com
ROBERT C. GRAHAM, JR., ESQ.
Fla. Bar No. 105951
Email: rgraham@mpdlegal.com
Secondary: mlewis@mpdlegal.com

        MILLS PASKERT DIVERS
        100 North Tampa Street, Suite 3700
        Tampa, Florida 33602
        Telephone: (813) 229-3500
        *Attorneys for Plaintiff*